Bolster, C. J.
This is an action of tort for personal injuries sustained by the plaintiff by being struck by the defendant’s motor truck used by the Sanitary Division of the defendant’s Department of Public Works. The driver of the truck was one P., a recipient of public aid, who had been directed by the Overseers of Public Welfare to work in the Sanitary Division. His immediate orders had been received from an inspector of that division to drive to a commercial establishment on Massachusetts Avenue to collect refuse. The accident occurred before his arrival there.
The defendant asked a ruling that P., a welfare worker, was not an employee of the city. That is not the test. The question is whether he was an agent ad hoc. His status closely resembles that of the “lent servant”. Denton v. Yazoo & Miss. Valley R. R., 284 U. S. 305. cf. Gates’ case, 1937 A. S. 487.
The real question in the case is whether the city, a municipal corporation, was his master, or whether he was the servant of a governmental agency performing service for *415 the public. It appeared that the sanitary division collects at public expense, and without charge, all domestic refuse, but that when it collects refuse from business concerns, it makes a charge of 11 cents a barrel. That last is the only basis for the finding for the plaintiff in this case. It is settled that a municipality is not liable for the negligence of a servant while performing free public service in waste disposal. Haley v. Boston, 191 Mass. 291. cf. cases collected in Bolster v. Lawrence, 225 Mass. 387. It is equally well settled that if a municipality goes into business, for revenue, it is liable for the negligence of its servants.
The classification generally adopted is
1. ) Governmental and public.
2. ) Revenue-producing and private. Professor Beale has suggested three classes, governmental, corporate and commercial. The difficulty in allocating a given case to one class or another results from the orthodox method of treating a case in hand by legal reasoning and logic instead of candidly admitting, as is true of most of our tort law, that the basic consideration is what the courts think is sound policy for the here and now. And in an effort to get a consistent and orderly whole, an undue value is apt to be given to older precedents, created at a time when human values weighed less in the balance than they do today, and when the conditions of community life differed widely from those of today. It may fairly be questioned whether liability would have been fastened upon water supply enterprises if the question had not come up at a time when private aqueduct companies occupied the field. How much weight a judge, in striving to make articulate the mores and needs of his people, will be swayed by the present tendency toward the socialization of all loss, as illus *416 trated by our workmen’s compensation laws, and that flood of tort litigation which evidences a feeling that if a person gets hurt someone else ought to pay for it, is going to depend a good deal on how that judge was brought up. A modicum of classification is possible.
1) If the legislature has commanded a municipality to perform some function of a public nature, there is no liability on the municipality even though a revenue is derived under the express or implied terms of the statute.
2) If, instead of a command, the legislature gives merely permission that the municipality shall function for a public purpose, one for the common good, specified in or within the scope of the act giving such permission, the municipality still remains not liable, and the right to obtain, or the actual obtaining of an incidental revenue therefrom does not change the rule. Liability to private action only exists when the legislature has created such liability, as in the case of defective streets.
3) As an exception to the foregoing, still of undefined extent, a city assuming to hold fixed property may become liable as an individual owner would be liable for private injury arising from negligent management.
4) A municipality which engages in a function, not primarily for the general advantage, but to lessen its own general financial burdens, is just as liable as a private corporation would be. Financial return is only material as an aid in determining whether the original entry into a given enterprise was to serve the general good, or to gain revenue for the municipality as such. Whether a given enterprise is public or corporate is a question not to be finally answered by the degree of return as it fluctuates from year to year, nor by considering whether at the pre *417 cise time of the accident, the business was carried on at a profit or a loss. Any such standard would be impossible of satisfactory application. Cost and return, gross or net, constantly vary. The report in an earlier case in this court showed the return from paid collection of mercantile refuse to be much larger than that here disclosed. In the present case, the total cost of the Sanitary Division in 1935 was $1,238,607.28 and the receipts from paid collections $22,253.66. The average cost per barrel for all refuse collected by the city was 23 cents. Its charge of 11 cents for commercial collections was greater than that charged by private contractors doing similar work. We do not understand these figures to be questioned. The basis of the decision for the plaintiff is that shown in the judge’s finding “that the truck was being used — in the conduct of a function voluntarily undertaken by (the defendant) for its own profit and commercial in character. That the collection and disposal of refuse of a mercantile business is not an act required to be performed by the defendant in its public capacity for the common good”. The last part of the quotation appears to us to savor more of a ruling of law than a finding of fact. It appears to make the court’s position turn more on whether the common good required the collection of mercantile refuse than upon the incidental character of the revenue-producing part, viewed in its proportion to the total business of refuse collection. The latter appears to be the only criterion thus far given by the cases. In many of those the revenue-producing part was voluntarily undertaken and could, as much as here, be said to be commercial and not demanded by the common good. This midway group of cases in which the degree of commercialization is stressed appears to be “in *418 that period of dry precedent which is so often to be found midway between a creative epoch and a period of solvent philosophical reaction”. Holmes, Common Law, p. 89.
We have not fortified the suggested classification by citations, because our survey of the decisions leads to the conclusion recently expressed by the United States Supreme Court that “no definite rule can be extracted from the decisions”. Brush v. Com’r of Int. Rev., U. S. Sup. Court (Mar. 15, 1937). cf. 34 Yale Law Jour. 129, 229. B. U. Law Rev. 7-147: 10-573: 16-777. Harvard Law Rev. 30-20: 34-66: 44-303: 46-305.
It was held in Haley v. Boston, 191 Mass. 291, that the corporation was not liable for the negligence of the driver of an ash cart who was collecting house refuse only, for which the city made no charge, although the same city department collected commercial refuse and charged for it. The court took pains to say that a different decision might, or might not, be reached had the injury been done by the latter division of the work.
In Stein v. Boston, App. Div. #147143 (28-20) it was held, affirming a finding for the defendant, that the city was not liable for injury done by a driver returning with an empty team, having during the day collected sixty barrels of refuse, three of which were commercial waste, giving a return to the city of forty-five cents. That decision does not necessarily control here, for it was this driver’s specific errand to collect only commercial waste, and it makes no difference whether he was going after his load, transporting it, or returning after disposing of it.
The report does not tell us when the provision in the ordinances upon which the judge based his conclusion that the venture was purely corporate or commercial, was first *419 passed. At the risk of going outside the record, we havd examined earlier ordinances. In the revision of 1882 all house-offal was to be removed by the superintendent of health, business ashes were removed at the expense of owners or occupants, and all other refuse deemed by the board of health injurious to the health of the city was to be removed by or at the expense of its owner.
The revision of 1898 required removal by the superintendent of streets, from yards and areas of all ashes, house-dirt, house-offal, and all noxious and refuse substances.
The revision of 1903 repeats the language of 1898.
The revision of 1914 provided that house refuse should be removed free of charge by the commissioner of public works, in charge of the department of public works; that he should not be required to remove mercantile refuse, but could do so on payment of such compensation as he should determine “all moneys so received to be used in paying the expenses incurred — in such removal”.
The revision of 1925 contains similar provisions, except that it omits the phrase in quotations above.
It would seem from this review that if this work of removal of mercantile refuse ever became a commercial venture undertaken for profit, it was when the city discontinued optional removal at cost, and began such removal at a fixed rate which might mean either a profit or a loss. We do not think the fact that the price of eleven cents a barrel is in excess of what private contractors charged indicates any more that the rates were designed to yield a profit than that the commissioner realized that public service was notoriously less efficient and more costly than private enterprise and, therefore, made an allowance to equalize income and outgo. Moreover, if the purpose of *420 the ordinance was special service at cost for the public good, we doubt if the commissioner could convert that purpose so as to turn it into a profit-yielding business venture. The fundamental purpose is that evidenced by the ordinance, not by the action of a subordinate officer in carrying out the ordinance.
The ordinance quoted in the report does not rest on a statute mandate, such as are sometimes imposed on political subdivisions. The provisions of G. L. Ch. 40 are chiefly permissive. It may be noticed here that by G. L. Ch. 40, §4, a town may make contracts for the exercise of its corporate powers, and for the disposal of its garbage, refuse and offal by contract, for sick relief, transportation of school children, and mechanical traffic regulations; By Ch. 111, and §31A, any person may remove or transport garbage, offal or other offensive substances. It seems to us, particularly in view of the association of subjects, that the fundamental impulse for the ordinance, and its dominant purpose, is not profit, but health conservation. Refuse is today well recognized as inimical to health and a source of sickness, particularly in the congested areas of a city. cf. Wheeler v. Boston, 233 Mass. 275. If it reaches the point of a nuisance, it can be abated at the owner’s expense. If prevention, instead of cure, is the road followed, the action does not .become a commercial adventure just because a fee is charged which bears a rough conformity to cost.
We think the special finding wrong, and that the action of the city should be classed as governmental and public, entailing no liability to private action. It is, therefore, unnecessary to consider whether, if a business venture, it was as such within the corporate powers, cf. Dillon, Mun. Corp. Ch. 32. The ordinance is presumptively valid. *421 Neither side has a motive to claim invalidity; not the plaintiff, for if it is ultra vires, the case is lost; not the defendant, lest a source of cost-reducing revenue be lost.
Judgment for defendant.